COMMONWEALTH vs. PAUL A. LONGO
(and two companion cases[1]).

Suffolk.  February 1, 1988. — June 8, 1988.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Assault and Battery. Joint Enterprise. Evidence*, State of mind.

At the joint trial of four defendants who were indicted for murder but convic-
ted of the lesser included offense of assault and battery, there was
sufficient evidence of a criminal joint venture to warrant the denial of
the defendants' motions for required findings of not guilty. [487-489]
No error was occasioned at the joint trial of four defendants for murder, in
which they were convicted of the lesser included offense of assault and
battery, by the admission of evidence that the victim had been dragged
160 feet down the street and kicked, while he was still alive shortly
after a fatal stab wound was inflicted, where evidence of such hostile
conduct of the defendants was properly admissible on the issue of the
defendants' intent or state of mind at the time the victim was stabbed.
[489-490]

INDICTMENTS found and returned in the Superior Court De-
partment on June 8, 1984.

The cases were tried before *Elbert Tuttle*, J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*William P. Homans, Jr.*, for Paul A. Longo.

*Jane A. Donohue*, Assistant District Attorney, for the Com-
monwealth.

*Thomas C. Horgan*, for Richard D. Garthe, Jr., was present
but did not argue.

*Anthony M. Fredella*, for Timothy Sullivan, joined in a brief.

---

[1] Commonwealth vs. Richard D. Garthe, Jr., and Commonwealth vs.
Timothy Sullivan.

ABRAMS, J. The defendants, Longo, Garthe, and Sullivan, indicted for murder, were convicted after joint trial of the lesser included offense of assault and battery of Edward Mullan.[2] The Appeals Court reversed the convictions, concluding that the defendants' motions for required findings of not guilty should have been granted. The Appeals Court determined that the Commonwealth failed to introduce sufficient evidence of a criminal joint venture. *Commonwealth* v. *Longo*, 23 Mass. App. Ct. 518 (1987). We granted the Commonwealth's application for further appellate review. We affirm the convictions.

In reviewing the denial of the defendants' motions, the Appeals Court accurately summarized the evidence in the light most favorable to the Commonwealth, *Commonwealth* v. *Campbell*, 378 Mass. 680, 686 (1979), as follows:[3] "The Commonwealth's principal witness was David John Charles, who, at the time of the criminal event, had been bunking for two weeks with the Harris family (Harris, his wife Debra, and their two children) and Stephen Sullivan in a ground floor apartment at 40 Jones Road, Revere. The adults were in the parlor when about 11:00 P.M., April 7, 1984, the appellants (defendants) Garthe, Longo, and Timothy Sullivan dropped in. Perhaps a half hour later, Randolph Roderick arrived. During the course of the night there was heavy drinking (Charles, however, said he had only two beers) suffused with the smell of marihuana. Roderick left the parlor one or more times to snort cocaine, which he carried in tinfoil.

"Around midnight, Edward Mullan, who had an apartment on the third floor, joined the party, accompanied by a number of his friends. They stayed for an hour or so. At one point,

---

[2] In connection with the violent death of Edward Mullan, five men, Paul A. Longo, Richard D. Garthe, Jr., Timothy Sullivan, Randolph Roderick, and Steven R. Harris, were indicted for murder, and a sixth, Stephen Sullivan, for being an accessory after the fact. The cases of Randolph Roderick and Stephen Sullivan were severed from the rest. The other four were convicted, after joint trial, of the lesser included offense of assault and battery, and severally sentenced to two and one-half years' imprisonment in Billerica house of correction. Steven Harris has not appealed his conviction. The other three have had their sentences stayed pending appeal.

[3] Additional facts are included in brackets. Footnotes have been omitted.

Harris and Mullan had a private meeting, from which they emerged amicably. However, Mullan showed displeasure at the way Longo was approaching Mullan's sister and girlfriend and said he would 'stick his [Longo's] head up his ass.' There was a scuffle between the two; Harris and others separated them. The Mullan party returned to the third floor apartment.

"Longo, wanting to know what Mullan's 'problem' was, started up the stairs of the building with Timothy Sullivan and Charles following. Evidently Longo reached Mullan's door. Turning, he ran down the stairs with Mullan and a few of Mullan's friends in pursuit. As Longo reached the ground floor common hallway, Mullan fell upon him and a ten-minute struggle followed between them, brutal on both sides. Mullan and others returned to the third floor, Longo and others to the parlor. Garthe, a friend of Longo, was angered by Mullan's having gouged and bloodied Longo's eye and said he would get even with Mullan.

"Some twenty minutes after the fight, Mullan and his party left the building. Harris, Garthe, Longo, Timothy Sullivan, and Charles (but not Roderick) mounted the stairs. Charles said he remained on the second floor landing while the others went on. They invaded Mullan's apartment and some or all of them did much damage to the furnishings. When the raiding party returned to Harris's parlor, Garthe was joking about having broken a door by butting it with his head.

"Harris telephoned Mullan's brother, John, from the parlor and Charles heard him say that he had trashed Eddie's apartment and Eddie was next. [Before calling, Harris told the group he was calling Mullan's brother.] About this time Roderick left the apartment and went to his car parked outside No. 40. Charles through a parlor window saw Roderick take a knife from the car. Roderick returned to the parlor carrying the knife, with a seven-inch blade, in his right hand. He placed the knife on the television set. [Charles said that all the defendants were in the parlor when Roderick brought in the knife.] Shortly, Roderick took up the knife, left the parlor, and evidently went into the adjacent bedroom. Charles heard a car pull up in front of the building. He went to the kitchen for a drink of water.

Standing at the sink, he heard [Mullan say he wanted to leave, and] Harris, in the interior hall, saying, 'If you want to leave, you got to go through me.' As Charles entered the hall from the kitchen, he saw Mullan doubled over. Roderick, facing Mullan, stabbed Mullan with a knife. Charles heard Mullan say he had enough, he gave up. Mullan fell on his side, his upper body in the parlor, the lower in the hall. At that point Harris was in the hall near Mullan's feet, Garthe stood in the parlor, near Mullan's head. Charles saw Roderick kicking Mullan in the face and yelling at him to get up; he heard Harris say that was enough, and Longo (from the parlor) say he's crazy, or the guy's crazy, or you guys are crazy. Charles, from his place in the hall, had seen Roderick stabbing Mullan but once, and he saw only Harris, Roderick, and Garthe. Longo (whose voice he heard) and, presumably, Timothy Sullivan and Stephen Sullivan, were in the parlor, unobserved by Charles.

"Charles, becoming physically ill, went toward the bathroom. Roderick rushed by Charles and attempted to pass his knife to him. Charles shrank from it. (Roderick was not seen again; he could have left the building through the kitchen.) Emerging from the bathroom, Charles saw Harris and Stephen Sullivan mopping up blood on the parlor floor. Harris asked Charles to help in the cleaning, and called him a wimp when he did not do so.

"Charles went to the street. Roderick's car was not there. Looking to his left, he saw Garthe, Longo, and Timothy Sullivan at a distance of twenty or thirty yards carrying Mullan up Jones Road, two at Mullan's shoulders, the other at his feet. Charles crossed the street. A police cruiser came by. Terrified, Charles discarded a folding knife that he was carrying and ran to his right." *Commonwealth* v. *Longo, supra* at 519-522.

We summarize the remaining evidence noted by the Appeals Court. A neighbor, awakened at 4:13 A.M. by what she took to be a scream, saw three men at the driveway to No. 52 Jones Road. Before they left, one man kicked something on the ground. Mullan's body was found in the driveway to No. 52

Jones Road. The medical examiner testified that abrasions on Mullan's back were consistent with his having been dragged from No. 40 to 52 Jones Road; their color indicated that Mullan was alive at the time the wounds were inflicted. The cause of death was a stab wound to the heart. *Id.* at 522-523.

The defendants were charged with murder, as well as with the lesser included offense of assault and battery. The theory of prosecution was joint venture. "The test [for joint venture] is whether each defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Bianco*, 388 Mass. 358, 366 (1983). *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). The defendants were present at the scene of the crime and in a position to render aid if necessary. The issue, therefore, is their state of mind at the time of the stabbing.

"[T]he jury may infer the requisite mental state [for a joint venture] from the defendant's knowledge of the circumstances and subsequent participation in the offense." *Id.* "[I]f one is, by agreement, in a position to render aid he is an abettor even if he does not participate[4] in the actual perpetration of the crime because his presence may encourage the perpetrator by giving him hope of immediate assistance." *Commonwealth* v. *Casale, supra*; *Commonwealth* v. *Soares, supra* at 471-472.[5]

---

[4] There was no evidence that the defendants physically participated in the stabbing attack on the deceased. In its brief, however, the Commonwealth argues that the defendants' dragging and kicking of Mullan after he had been stabbed, and while he was still alive, constituted a second attack and provided an independent basis for the convictions for assault and battery. We agree with the Appeals Court that the defendants' convictions cannot be upheld on this basis. The case was not tried to the jury on the theory of a second attack after the stabbing. On the contrary, any assault and battery that may properly be called a lesser "included" offense of murder would have to be tied to the act that caused the decedent's death, the stabbing. Thus, the Appeals Court was correct in concluding that the dragging and kicking were not, in the minds of the jurors, a possible independent basis for the convictions. See *Commonwealth* v. *Longo, supra* at 526-527.

[5] A person cannot be found guilty as a joint venturer solely for being present at the commission of a crime with knowledge of the planned act,

"In order to succeed with the joint venture theory, the prosecution must show that each defendant shared the mental state required [for assault and battery]." *Commonwealth* v. *Funches*, 379 Mass. 283, 295 (1979).

"A person's knowledge or intent is a matter of fact, which is often not susceptible of proof by direct evidence, so resort is frequently made to proof by inference from all the facts and circumstances developed at the trial. . . . The inferences drawn by the jury need only be reasonable and possible and need not be necessary or inescapable . . ." (citations omitted). *Commonwealth* v. *Casale, supra.* "The line that separates mere knowledge of unlawful conduct and participation in it, is 'often vague and uncertain. It is within the province of the jury to determine from the evidence whether a particular defendant [has] crossed that line.' " *Commonwealth* v. *Cerveny*, 387 Mass. 280, 287 (1982), quoting *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 250 (1971). "To the extent that conflicting inferences are possible from the evidence, 'it is for the jury to determine where the truth lies.' " *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981), quoting *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978).

Viewing the evidence in the light most favorable to the Commonwealth, *Commonwealth* v. *Campbell*, 378 Mass. 680, 686 (1979), we conclude that the jury reasonably could infer the requisite mental state for a joint venture from the circumstances and from the conduct of the defendants. There was evidence of hostility between Mullan and the defendants. Longo fought brutally with Mullan earlier in the evening. After the fight, Garthe said he would get even for the injuries Mullan inflicted on Longo. All three defendants then participated in vandalizing Mullan's apartment. Later, Harris telephoned Mullan's brother to say that he (Harris) had just destroyed the apartment and that Mullan was next. When the call was placed,

---

*Commonwealth* v. *Casale, supra* at 173, nor for failing to take affirmative steps to prevent it. *Commonwealth* v. *Benders*, 361 Mass. 704, 708 (1972). *Commonwealth* v. *Michel*, 367 Mass. 454, 457 (1975). The element of "agreement" or intent is essential. The judge so instructed the jurors, and the defendants do not challenge the instructions.

the three defendants were in the parlor; the telephone was located in or near the parlor. The jury reasonably could have inferred that the three defendants heard Harris's statement that Mullan was next.

From the evidence that Roderick carried a knife with a seven-inch blade into the parlor where the three defendants were present, the jury reasonably could have inferred that all three saw the knife and knew Roderick had it in his possession. When Mullan returned to 40 Jones Road, Harris met him at the door and blocked his exit from the apartment; Charles went to the kitchen; Roderick came from the bedroom and Garthe from the parlor. The conduct of the men converging on Mullan in the hallway permitted the jury to infer that joint action against Mullan was planned by the defendants.[6]

In summary, there was evidence from which the jurors could infer that the defendants knew of the murder weapon in Roderick's possession; in addition, the defendants' conduct after Mullan's arrival permits an inference that the men knew an attack was planned, and that they were willing to lend assistance if necessary.[7] This was sufficient for the jury to infer the requisite agreement among the defendants to participate in the assault in the apartment. See *Commonwealth* v. *Millyan*, 399 Mass. 171, 187-188 (1987); *Commonwealth* v. *Casale*, *supra*. Contrast *Commonwealth* v. *Burrell*, 389 Mass. 804 (1983) (no evidence that defendant knew the slayer or associated with him); *Commonwealth* v. *Fancy*, 349 Mass. 196

---

[6] In concluding that there was no evidence of an agreement, the Appeals Court suggests that Roderick's assault was spontaneous and unpredictable. See *Commonwealth* v. *Longo, supra* at 525 n.10. That is one reasonable inference to draw from the evidence. The jurors, however, could have inferred that the conduct of the men tended to show a shared intent to harm Mullan. It is for the finder of fact to determine what inferences to draw from the evidence.

[7] To the extent that Longo's words and conduct permit conflicting inferences, "[i]t is sufficient to say that, from the stated evidence, the conduct of [Longo] following [his] words falls far short of requiring a finding that [Longo] had made a timely withdrawal from the criminal enterprise." *Commonwealth* v. *Dellelo,* 349 Mass. 525, 532 (1965).

(1965) (no evidence of defendant's knowledge of crime or presence at scene).

Relying on *Commonwealth* v. *Blaikie*, 375 Mass. 601, 605-606 (1978), the defendants argue that their convictions must be reversed in any event because the judge erred in permitting the jurors to consider the kicking and dragging of Mullan 160 feet down the street after the stabbing. The defendants assert that their conduct after the stabbing should have been considered only as to consciousness of guilt, and that the judge's failure to so limit that evidence requires reversal. We do not agree.

The defendants take too narrow a view of the evidence relevant to their mental state at the time of the stabbing. The Commonwealth is entitled to "show the whole transaction of which the crime was a part. . . . Evidence of the attendant circumstances may aid the jury in reaching a verdict by giving them the complete picture." *Commonwealth* v. *Durkin*, 257 Mass. 426, 428 (1926). *Commonwealth* v. *Corcoran*, 252 Mass. 465, 478 (1925). See also *Commonwealth* v. *Borans*, 379 Mass. 117, 149 (1979). This is especially true "where motive and credibility of witnesses are in issue." *Commonwealth* v. *Alicea*, 376 Mass. 506, 522 (1978). The nature of the later injuries and the conduct of the defendants after the stabbing could be found by the jury to be evidence of a continuation of an original agreement to assist the principal in a joint venture to harm Mullan in the apartment. Hostile actions taken after an attack at a time when the victim is alive may be considered on the issue of intent. See *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981). The action taken after the attack by the defendants, unlike the action in *Commonwealth* v. *Blaikie*, was not limited to an attempt to avoid detection and detention.[8] The defendants' actions following the stabbing

---

[8] The judge in the present case properly limited the jury's consideration of the defendants' attempts to conceal the body to the issue of consciousness of guilt. The defendants do not argue otherwise.

and while Mullan was alive properly were before the jury as evidence of their mental state[9] at the time of the stabbing.

The judge's instructions properly focused the jury's attention on the defendants' intent at the time Mullan came into the apartment. There is no error in the judge's determination that the evidence was sufficient to warrant submission of the case to the jury on the theory of joint venture on the lesser included charge of assault and battery committed in the apartment.

> *Judgments of the Superior*
> *Court affirmed.*

---

[9] It is unnecessary to deal with the defendants' argument that the evidence before the grand jury was insufficient to support the indictments, because that evidence, in truncated form, is the same evidence we conclude supports the convictions.